UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

RITA MASTERS and ROBERT MASTERS )  DOCKET NO.:
   Plaintiffs )

Vs.

CRACKER BARREL OLD COUNTRY
STORE, INC. and
ROSE ACRE FARMS, INC.,
   Defendants

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1. Plaintiffs, Rita Masters ("Plaintiff, Ms. Masters") is a natural person who has a principal place of residence at 396 North Billerica Road, Tewksbury, Massachusetts.

2. Plaintiff, Robert Masters ("Plaintiff Mr. Masters") is a natural person and the spouse of "Plaintiff Ms. Masters" and has a principal place of residence at 396 North Billerica Road, Tewksbury, Massachusetts.

3. Defendant, Cracker Barrel Old Country Store, Inc. ("Defendant Cracker Barrel") is a corporation incorporated under the laws of the State of Tennessee with a principal place of business located at 1 Hartman Drive, Lebanon, Tennessee.

4. Defendant, Rose Acre Farms, Inc. (Defendant Rose Acre") is a corporation incorporated under the laws of the State of Indiana with a principal place of business located at 1657 W. Tipton Street, Seymour, Indiana.

1

## JURISDICTION AND VENUE

5. Plaintiffs reallege and reaver the allegations contained in paragraphs 1 through 4 above and specifically incorporate them herein.

6. Jurisdiction is based upon diversity of citizenship of the parties and the amount in controversy exceeds, exclusive of interest and costs, the sum specified in 28 U.S.C., § 1332, and because there is complete diversity of citizenship between Plaintiffs and Defendants.

## FACTS

7. Plaintiffs reallege and reaver the allegations contained in paragraphs 1 through 6 above and specifically incorporate them herein.

8. Defendant, Cracker Barrel is a restaurant chain that owns all of its restaurant locations including Store #81 located in Roanoke Rapids, North Carolina.

9. Defendant, Rose Acre, upon information and belief, at all relevant times was the second largest egg producer in the United States with 17 egg production centers in 8 states, including its Hyde County facility in North Carolina.

10. Defendant, Rose Acre, upon information and belief sells and distributes its eggs in interstate commerce to large grocery stores and restaurant chains, including Defendant, Cracker Barrel.

### *Salmonella*

11. *Salmonella* is an enteric bacterium, which means that it lives in the intestinal tracts of human and other warm-blooded animals.

12. *Salmonella* bacteria are usually transmitted to humans who consume foods contaminated with feces. Such foods usually look and smell normal, meaning that a consumer has no warning of the fact of contamination.

2

13. After being ingested, *Salmonella* bacteria travel to the lumen of the small intestines then penetrate the epithelium, multiply, and enter the blood. This infection process - also referred to as the incubation period - usually takes 6 to 72 hours for the onset of symptoms.

14. The acute symptoms of *Salmonella* gastroenteritis (or *Salmonellosis*) include nausea, vomiting, diarrhea, fever, abdominal cramping and/or stomach pain, dysuria, muscle pain, fatigue and dehydration.

15. When severe infection occurs, hospitalization is required and *Salmonella* may spread from the intestines to the bloodstream and then to other body sites.

16. *Salmonella* can be found in a variety of foods. In recent years, fecal contamination has led to large-scale *Salmonella* outbreaks linked to chicken/eggs. Those outbreaks include poultry from Foster Farms, Tyson Foods and Rose Acre Farms, Inc.

17. From March 26, 2018 to April 11, 2018, the FDA conducted a thorough inspection of Defendant, Rose Acre's Hyde County Farm and collected samples for testing and determined said facility to be the likely source of a multi-state *Salmonella* outbreak.

18. During said inspections, the FDA found Defendant, Rose Acre in violation of FDA's egg safety rule, 2.CFR116, in violation of 402(a)(4) of the FD&C Act, 21 USC, Sec. 342(a)(4) "in that they have been prepared, packed, or held under insanitary conditions whereby they may have become contaminated with filth, or whereby they may have been rendered injurious to health".

19. On or about April 11, 2018, FDA inspector's observations and deviations were submitted in writing (FDA-482) to Defendant, Rose Acre's Complex Manager.

3

20. On or about April 13, 2018 (the same day Plaintiff, Ms. Masters, consumed eggs at Defendant, Cracker Barrel), Defendant, Rose Acre voluntarily recalled eggs produced at its Hyde County Facility.

21. Upon information and belief, Defendant, Rose Acre distributed eggs to Defendant, Cracker Barrel via a third party distributor on a weekly basis.

22. On April 13, 2018, while in route to Myrtle Beach, South Carolina, Plaintiffs stopped for supper at Defendant, Cracker Barrel's Store #81 in Roanoke Rapids, North Carolina.

23. Plaintiff, Ms. Masters, ordered an egg breakfast known as "Sunrise Sampler". She also ordered unsweetened ice tea. Plaintiff, Mr. Masters, ordered a "Fish Fry" and unsweetened ice tea.

24. Prior to April 13, 2018, Plaintiff, Ms. Masters', health was normal for a 73 year old woman.

25. On or about April 14, 2018, at around 3-4 pm, Plaintiff, Ms. Masters began to feel poor, her stomach felt "in a knot".

26. Ms. Masters' condition worsened with diarrhea starting in the early hours of April 15 and continued for approximately 3-4 days (April 18 - April 19, 2018). During this period of time, the Masters called Ms. Masters' Primary Care Doctor's Office (Dr. Drake) a couple of times (the first time being on April 15, 2018) regarding how to deal with Ms. Master's diarrhea.

27. Plaintiffs returned to Massachusetts on April 22, 2018.

28. By letter dated April 24, 2018, "Plaintiff, Mr. Masters" notified "Defendant, Cracker Barrel" of "Plaintiff, Ms. Masters' food poisoning.

29. Monday, April 30, Plaintiff, Ms. Masters' blood pressure started swinging between extremely high and low and she started to get "tingling" in her fingertips. The swings in

blood pressure and the finger tingling continued into the next day. In addition, Ms. Masters began to notice weakness in her calve muscles.

30. As a result of her worsening condition, Ms. Masters was taken to the Lowell General Hospital ER that afternoon (May 1, 2018). Ms. Masters was admitted into the hospital and underwent a series of tests including CT Scan of her head; MRI with and without spine images and a lumbar puncture. The lumbar puncture showed evidence of protein.

31. Plaintiff, Ms. Masters' condition worsened and she was admitted into ICU and intubated on May 3, 2018 wherein she was diagnosed with Guillain Barre Syndrome ("GBS"). GBS is an immune mediated neuropathy. Plaintiff, Ms. Masters then began her first Intravenous Immune Globulin ("IVIG") treatment; a treatment that she continues today.

32. Plaintiff, Ms. Masters remained in ICU for seven (7) days until she transferred to the Intermediary Coronary Care Unit ("ICC") on May 10, 2018. During these seven (7) days, Ms. Masters continued have numbness in her fingers and now in her feet. She underwent six (6) IVIG infusion treatments and received respiratory and other physical therapy.

33. On May 15, 2018, Plaintiff, Ms. Masters, was transferred by ambulance to New England Rehabilitation Hospital for in-patient acute rehabilitation services.

34. On May 18, 2018, Plaintiff, Ms. Masters was diagnosed with "C diff" which severely limited her rehabilitation.

35. While at New England Rehabilitation Hospital, Plaintiff, Ms. Masters, received multiple IVIG infusion treatments, each lasting approximately 4-4 ½ hours.

36. On June 12, 2018, Plaintiff, Ms. Masters was discharged from New England Rehabilitation Hospital and taken by ambulance to Lahey Hospital and admitted for neurology services.

5

37. White at Lahey Hospital, after several tests, it was determined Plaintiff, Ms. Masters' GBS had evolved into severe Chronic Inflammatory Deymelinating Polyradiculoneuropathy ("CIDP"). Plaintiff, Ms. Masters received two (2) more IVIG infusion treatments at Lahey Hospital.

38. On June 25, 2018, Plaintiff, Ms. Masters was transferred by ambulance back to New England Rehabilitation Hospital to restart physical therapy.

39. Plaintiff, Ms. Masters remained at New England Rehabilitation Hospital for six (6) weeks, being discharged on August 1, 2018.

40. Although discharged from in-patient physical therapy, Plaintiff, Ms. Masters could only ambulate by wheelchair or walker.

41. On August 6, 2018, Plaintiff, Ms. Masters began receiving home care. She showed slight improvement in feeling and strength in lower arms and hands, yet loss of strength in her legs below the knees.

42. Between September 12, 2018 and September 17, 2018, Plaintiff, Ms. Masters was readmitted to Lahey Hospital, wherein she received five (5) more IVIG infusions.

43. Plaintiff, Ms. Masters' home health care continued until October 10, 2018. Plaintiff, Ms. Masters continued to receive IVIG infusions.

44. On October 17, 2018, Plaintiff, Ms. Masters began Outpatient Occupational and Physical Therapy. Plaintiff, Ms. Masters continued her physical therapy for ten (10) weeks until December 27, 2018. During this ten (10) week period Plaintiff, Ms. Masters received IVIG infusion treatments.

45. On November 12, 2018, (approximately seven (7) months after eating at Cracker Barrel) and after Plaintiff, Ms. Masters was finally able to start walking on her own. She began

Outpatient Occupational Therapy. This continued for four (4) weeks until December 12, 2018.

46. On December 27, 2018, Plaintiff, Ms. Masters was discharged from Outpatient Physical Therapy, while continuing to receive IVIG infusion treatments. The treatments occurred on a more regular schedule (each taking approximately 4 - 4 ½ hours) to occur approximately every three (3) weeks.

47. Due to a combination of the IVIG regimen and the Occupational and Physical Therapy, the numbness in Plaintiff, Ms. Masters' feet lessened to the extent that she was able to drive her car for the first time on June 12, 2019 (fourteen (14) months after eating at Cracker Barrel). Plaintiff, Ms. Masters had additional five (5) sessions of Outpatient Physical Therapy from August 14, 2019 to September 25, 2019 in order to improve her functionality.

48. Despite her progress, Plaintiff, Ms. Masters will continue to need the three-week regimen of IVIG Infusion.

49. As a direct and proximate result of Defendants, Plaintiff, Ms. Masters contracted a *Salmonella* illness and Plaintiffs have suffered losses, including, but not limited to, hospital, rehabilitation, pharmacy and other medical expenses, mental and physical pain, future disability, emotional distress and other damages as may be proved at trial.

## CLAIMS FOR RELIEF AS AGAINST DEFENDANT, CRACKER BARREL

### COUNT I

(Negligence)

50. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-49 and specifically incorporate them herein.

51. Defendant, Cracker Barrel had a duty to exercise ordinary care in the purchase, storage, handling and preparation of egg products it sold to its customers.

52. Defendant, Cracker Barrel breached its duty to Plaintiff, Ms. Masters by among other things:

    a) Failing to properly operate its restaurant in a safe, clean and sanitary manner;

    b) Failing to apply proper food safety policies to ensure proper preparation and cooking of egg meals;

    c) Failing to prevent and the transmission of *Salmonella* to its customers who order and eat egg meals;

    d) Failing to properly train its employees how to prevent transmission of *Salmonella* on its premises;

    e) Other acts and/or omissions as revealed in discovery.

53. As a direct and proximate result of Defendant's breach of duty, "Plaintiff, Ms. Masters" was caused to suffer serious personal injury; incur hospital, medical and pharmaceutical expenses and suffer total and partial disability, as well as pain of body and mind.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT II

(Breach Of Implied Warranties Under Uniform Commercial Code)

54. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-53 and specifically incorporate them herein.

55. Defendant, Cracker Barrel, had a duty to comply with the implied warranty of merchantability and fitness for a particular purpose.

56. Defendant, Cracker Barrel sold an egg meal to Plaintiff, Ms. Masters which did not pass without objection in the trade; the eggs were not fit for the ordinary purposes for which they were intended to be used.

57. Plaintiff, Ms. Masters was a foreseeable consumer of the defective product/meal.

58. Defendant, Cracker Barrel had a duty to comply with the Unform Commercial Code, as said Defendant knew the particular purpose for which the goods were required and that Plaintiff, Ms. Masters, as a buyer was relying on Defendant's skill or judgment to furnish suitable goods and thus there existed an implied warranty that said goods (eggs) shall be fit for such purpose.

59. Defendant, Cracker Barrel's breach of the implied warranties was the direct and proximate result of Plaintiffs' injuries.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT III

### (Loss of Consortium)

60. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-59 and specifically incorporate them herein.

61. "Plaintiff, Mr. Masters" is the spouse of "Plaintiff, Ms. Masters" and the person entitled by laws to the care, comfort, services and consortium of the "Plaintiff, Ms. Masters".

62. As a direct and proximate result of the negligence of the Defendant, "Plaintiff, Mr. Masters" sustained the loss of consortium of his spouse," Plaintiff, Ms. Masters."

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

9

## CLAIMS FOR RELIEF AS AGAINST DEFENDANT, ROSE ACRE

### COUNT I

(Strict Liability Production Defect)

63. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-62 and specifically incorporate them herein.

64. The adulterated eggs that Defendant, Rose Acre produced and Plaintiff, Ms. Masters consumed, were defective and unreasonably dangerous at the time it left Rose Acre's control.

65. The product was defective and unreasonably dangerous because it was unable to be used as safely as an ordinary consumer would expect when the produce was used in a reasonably foreseeable manner.

66. Defendant, Rose Acre owes a duty not to deliver or offer eggs unfit for human consumption.

67. Defendant, Rose Acre delivered and sold adulterated eggs to the Plaintiff, Ms. Masters and is therefore strictly liable to the Plaintiff, Ms. Masters for all injuries and damages proximately caused by Ms. Masters exposure to the Defendant's defective and unsafe eggs under applicable law.

68. As a result of the fault of Defendant, Rose Acre, Plaintiffs suffered harms and losses as described in the preceding paragraphs.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

### COUNT II

(Strict Liability - Failure To Warn)

69. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-68 and specifically incorporate them herein.

70. The adulterated eggs that Defendant, Rose Acre produced and Plaintiff, Ms. Masters consumed were defective and unreasonably dangerous at the time it left Defendant, Rose Acres control.

71. The product was defective and unreasonably dangerous because Defendant, Rose Acres knew, or should have known, that the product did not provide adequate warnings of the danger and did not contain proper instructions for reasonably safe human consumption.

72. Defendant, Rose Acres had a duty not to deliver or offer eggs unfit for human consumption pursuant to applicable law.

73. Defendant, Rose Acres delivered and sold adulterated eggs to the Plaintiff, Ms. Masters and is therefore strictly liable to the Plaintiffs for all injuries and damages proximately caused by Plaintiff, Ms. Masters' exposure to the Defendant, Rose Acres' defective and unsafe eggs under applicable law.

74. As a result of the fault of Defendant, Rose Acres, Plaintiffs suffered harms and losses as described in the preceding paragraphs.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT III

(Breach of Implied Warranties Under Uniform Commercial Code)

75. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-74 and specifically incorporate them herein.

76. Defendant, Rose Acre, had a duty to comply with the implied warranty of merchantability and fitness for a particular purpose.

77. Defendant, Rose Acre sold an eggs that were used in a meal sold to Plaintiff, Ms. Masters which did not pass without objection in the trade; the eggs were not fit for the ordinary purposes for which they were intended to be used.

78. Plaintiff, Ms. Masters was a foreseeable consumer of the defective product/meal.

79. Defendant, Rose Acre had a duty to comply with the Unform Commercial Code, as said Defendant knew the particular purpose for which the goods were required and that Plaintiff, Ms. Masters, as a consumer was relying on Defendant's skill or judgment to furnish suitable goods and thus there existed an implied warranty that said goods (eggs) shall be fit for such purpose.

80. Defendant, Rose Acre's breach of the implied warranties was the direct and proximate result of Plaintiffs' injuries.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT IV

### (Negligence)

81. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-80 and specifically incorporate them herein.

82. Defendant, Rose Acre had a duty to exercise ordinary care in the production, delivery, storage and preparation of eggs sold to their customers.

83. Defendant, Rose Acre failed to exercise a reasonable degree of care, skill, and diligence ordinarily employed by a producer and seller of eggs in similar conditions. This failure caused *Salmonella* to contaminate eggs sold to the public and consumed by Plaintiff, Ms. Masters.

12

84. Defendant, Rose Acres breached the duties owed to the consumers of its eggs by committing the following negligent acts and omissions:

   a) Failing to adequately maintain and monitor the safety of its products, premises, equipment and employees;

   b) Failing to properly operate its facilities and equipment in a safe, clean, and sanitary manner;

   c) Failing to adopt adequate food safety po9licies and procedures, specifically failing to develop adequate Hazard Analysis and Critical control Point plans designed to minimize the risk of bacterial contamination;

   d) Failing to apply its food safety policies and procedures to ensure the safety and sanitary conditions of its food products, premises, and employees;

   e) Failing to adopt, implement, and validate food safety policies and procedures that met industry standards for the safe and sanitary production of food products, and the safety and sanitary conditions of its premises and employees;

   f) Failing to prevent the transmission of *Salmonella* to consumers of its eggs;

   g) Failing to properly train its employees and agents how to prevent the transmission of *Salmonella* on its premises, from its facility or equipment, or in its food products;

   h) Failing to properly supervise its employees and agents to prevent the transmission of *Salmonella* on its premises, from its facility or equipment, or in its food products;

   i) Failing to adequately test its products and processing environment for microbial pathogens, like *Salmonella*; and,

   j) Other acts and omissions as revealed through discovery.

85. As a direct and proximate result of Defendant's breach of duty, "Plaintiff, Ms. Masters" was caused to suffer serious personal injury; incur hospital, medical and pharmaceutical expenses and suffer total and partial disability, as well as pain of body and mind.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT V

(Negligent Infliction of Emotional Distress)

86. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-85 and specifically incorporate them herein.
87. Defendant, Rose Acre was negligent in its production, distribution and sale of its eggs which was the direct and proximate cause of Plaintiff, Ms. Masters' injuries.
88. Plaintiff, Mr. Masters, as a direct result of the injuries suffered by his spouse, suffered emotional distress.
89. The emotional distress suffered by Plaintiff, Mr. Masters was caused by Defendant's negligence.
90. Plaintiff, Mr. Masters' emotional distress was evidenced by physical harm which manifested itself by objective symptomology.
91. The emotional distress suffered by Plaintiff, Mr. Masters was consistent with what a reasonable person would have suffered under similar circumstances.

WHEREFORE, Plaintiffs pray for the relief as more fully set forth below.

## COUNT VI

### (Loss of Consortium)

92. Plaintiffs reallege and reaver the allegations contained in paragraphs 1-91 and specifically incorporate them herein.

93. "Plaintiff, Mr. Masters" is the spouse of "Plaintiff, Ms. Masters" and the person entitled by laws to the care, comfort, services and consortium of the "Plaintiff, Ms. Masters".

94. As a direct and proximate result of the negligence of the Defendant, "Plaintiff, Mr. Masters" sustained the loss of consortium of his spouse," Plaintiff, Ms. Masters."

WHEREFORE, Plaintiffs pray this Honorable Court for the following relief as against the Defendants:

1. Enter judgment in Plaintiffs' favor in an amount determined by the Court.
2. Award Plaintiffs such other and further relief as the Court deems just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY AS TO ALL COUNTS.**

Dated: April 8, 2021

Respectfully submitted,
RITA MASTERS and
ROBERT MASTERS,
By Their Attorneys,

Timothy H. Barnes, Esquire
B.B.O. #549318
HONIG & BARNES LLP
55 Wingate Street
Haverhill, MA 01832
978-374-4420
tbarnes@honigbarnes.com